UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CLINTON CHANDLER,

                Petitioner,                CASE NO. 08-CV-10249

v.

                                    PAUL D. BORMAN
                                    UNITED STATES DISTRICT JUDGE


JERRY-ANN SHERRY,                MAGISTRATE. JUDGE CHARLES E. BINDER

                Respondent.
_____/

## OPINION AND ORDER DENYING THE HABEAS CORPUS PETITION AND DENYING A CERTIFICATE OF APPEALABILITY, BUT GRANTING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

      This matter is pending before the Court on petitioner Clinton Chandler's *pro se* habeas corpus petition under 28 U.S.C. § 2254. The habeas petition challenges Petitioner's convictions for armed robbery, assault with intent to do great bodily harm, and assault with a dangerous weapon (felonious assault). Petitioner alleges that (1) he was denied his right to present exculpatory evidence, (2) the trial court's jury instructions deprived him of a fair trial, (3) he is entitled to a new trial on the basis of newly discovered evidence, (4) he was convicted on the basis of a highly suggestive pretrial identification procedure, and (5) his trial attorney was ineffective. Respondent urges the Court to deny the petition. The Court agrees that Petitioner is not entitled to the writ of habeas corpus. Accordingly, the habeas petition will be denied.

### I. Background

      Petitioner was charged in Wayne County, Michigan with two counts of armed robbery, one count of assault with intent to commit murder, one count of felonious assault, possession of

a firearm by a felon, and possession of a firearm during the commission of a felony.  Petitioner

was tried jointly before a single jury with his co-defendant, Ervin Johnson.  The state court

summarized the facts as follows:

> Defendants were convicted of robbing Brandon Tiffner and John Pappas, and of separately feloniously assaulting Tiffner, and assaulting Pappas with the intent to do great bodily harm, while Tiffner and Pappas were attempting to purchase a pound of marijuana.  According to the testimony of the victims in this case, they drove near a residence to purchase the marijuana when defendants approached the car and asked if the victims were there to purchase marijuana.  Because they were under the impression that they would be purchasing the marijuana from a different individual, they initially told defendants they were not there to purchase marijuana.  After making a telephone call to their "contact" who told them defendants were the people they needed to talk to, they summoned defendants back and they got into the victim's car.  Johnson got in the back seat behind Pappas and Chandler got in the back seat behind Tiffner.  Chandler told Pappas to drive up the street because they were going to a safe house to get the marijuana. After driving about two blocks, Chandler told Pappas to park on the side of the street.  Once they stopped and parked, Johnson opened his door and two guns were pulled out.  Tiffner turned around and saw Johnson point one gun at Pappas's neck and Chandler pointed the other gun at Pappas's side.  As soon as the guns were drawn, Chandler tried to grab the car keys and both defendants yelled for Pappas to give them the money.  Chandler then got out of the car and opened Tiffner's door and pulled him out of the car by his shirt.  Chandler searched Tiffner and removed his telephone, wallet, keys, and shoes.  He had Tiffner bent over the car's windshield and continued to pat Tiffner down.  When Tiffner tried to look back, he was struck in the face with something hard that resulted in a black eye and swelling of his face.

> As he was held over the windshield, Tiffner could see that Johnson was still in the back seat and was reaching around the front seat as he pointed the gun at Pappas. Tiffner then saw Johnson shoot Pappas in the back.  Pappas had the money under his leg and, when he was shot, he curled up in a ball.  Tiffner saw Johnson take the money after shooting Pappas.  Johnson also ripped out the compact disc player from Pappas's car.  After Johnson said that he had the money, both defendants ran off.

> When he talked to the police, Tiffner gave a description of both defendants. Chandler was wearing a white tank top at the time of this offense, Tiffner did not recall seeing any tattoos, but was not paying close attention to whether he had any.  Tiffner identified both defendants in a photographic lineup and stated to police officers he had no doubt that they were the responsible

parties.

John Pappas testified that he had about $1,250 with him to buy marijuana. He identified both defendants at trial as the men who approached his vehicle and asked if he and Tiffner were waiting to purchase marijuana. According to Pappas, one of the defendants tried to grab his keys and then Johnson stuck a gun in his ribs. One of defendants yelled to give him the money. After both Pappas and Tiffner told defendants that they did not have the money, Pappas saw Chandler strike Tiffner in the side of his head. Pappas saw that Chandler had a small handgun and after he saw that Tiffner was hit, Pappas decided it was not worth it to get shot, so he gave Johnson the money, but he still shot him.

The principal issue at trial was identification. Tiffner identified both defendants in a photographic lineup and had no doubt they were the responsible parties. Pappas also identified defendants at trial as the men involved in this offense. Chandler presented an alibi defense through his girlfriend, who testified that he was with her the entire day on the date of the charged offense.

*People v. Chandler*, No. 259430, at 2-3 (Mich. Ct. App. June 29, 2006).

On October 25, 2004, the jury found Petitioner guilty of two counts of armed robbery, MICH. COMP. LAWS § 750.529, one count of assault with intent to do great bodily harm less than murder (as a lesser-included offense of assault with intent to commit murder), MICH. COMP. LAWS § 750.84, and one count of felonious assault, MICH. COMP. LAWS § 750.82. He was acquitted of the firearm charges.[1] The trial court sentenced Petitioner to concurrent prison terms of twenty-five to fifty years for the armed robberies, five to fifteen years for the felonious assault, and five to ten years for the assault with intent to do great bodily harm. The Michigan Court of Appeals affirmed Petitioner's convictions and sentence, and on February 7, 2007, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the

---

[1] Ervin Johnson was convicted of the same offenses, as well as, possession of a firearm by a felon and possession of a firearm during the commission of a felony.

issues. *See People v. Chandler*, 477 Mich. 1017 (2007).[2]

Petitioner filed his habeas corpus petition on January 16, 2008. His claims are:

I.      Petitioner was denied his constitutional right to present exculpatory evidence at trial.

II.     The failure to instruct Petitioner's jury that robbery armed is a specific intent crime and that aiders and abetters must have the necessary specific intent to be guilty of a specific intent crime constitutes reversible error as it denied him a fair trial.

III.    Petitioner is entitled to a new trial based on newly discovered evidence.

IV.    Petitioner Chandler was denied due process of law and a fair trial when he was convicted of the basis of identification testimony that was the result of a highly suggestive pretrial identification procedure.

V.     Petitioner Chandler was denied the effective assistance of counsel when defense counsel failed to move for suppression of the identification testimony of Tiffner and Pappas, failed to seek an in-court line-up, and failed to present the testimony of an expert on eyewitness identification.

Respondent argues in an answer to the petition that Petitioner's claims were waived, are not cognizable on habeas review, are procedurally defaulted, or lack merit. To the extent that any of Petitioner's claims are procedurally defaulted, the Court elects to address the claims on their merits. Procedural default is not a jurisdictional limitation. *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009) (citing *Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991)), *cert. denied*, __ U.S. __, 130 S. Ct. 3274 (2010).

## II. Standard of Review

Petitioner is entitled to habeas corpus relief only if the state court's adjudication of his

---

[2] Justice Marilyn Kelly voted to grant leave to appeal.

claims on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under 28 U.S.C. § 2254(e)(1), a state court's factual determinations are presumed to be correct unless the habeas petitioner rebuts the presumption of correctness with clear and convincing evidence.

Granting a habeas petition under the "contrary to" clause is appropriate only "if the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application" of clearly established federal law "if the state court identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Instead, a habeas court must ask "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

### III. Discussion

### A. The Right to Defend

Petitioner alleges that he was denied his constitutional right to present a defense by the trial court's ruling that he could not show his body tattoos to the jury, nor expose the tattoos by

wearing a tank top while seated at the defense table during trial.  Petitioner wanted the jury to

see the extensive tattoos on his arms because Brandon Tiffner informed the police that one of the

robbers was wearing a white tank top, but he apparently failed to mention that Petitioner's arms

were covered with tattoos.[3]  Petitioner contends that showing his tattoos to the jury would have

substantiated his defense of misidentification, because, in his opinion, anyone seeing him in a

tank top would have noticed his tattoos.  The Michigan Court of Appeals adjudicated Petitioner's

claim on the merits and found no error in the trial court's decision not to allow Petitioner to

remove his shirt before the jury.

### 1.  Clearly Established Federal Law

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in

the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution

guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'"

*Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683,

690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  Although "[a]

defendant's right to present relevant evidence is not unlimited," *United States v. Scheffer*, 523

U.S. 303, 308 (1998), the Constitution "prohibits the exclusion of defense evidence under rules

that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to

promote . . . ."  *Holmes v. South Carolina*, 547 U.S. at 326.

---

[3]  One police officer testified that Brandon Tiffner described suspect number two to the police as someone having several tattoos.  The officer conceded, however, that this information was not included in the police department's computerized record of Tiffner's witness statement (Trial TR. October 21, 2004, Pp. 58, 65-68), and the officer who actually interviewed Tiffner did not think that Tiffner mentioned any tattoos when describing the suspects to him.  *Id*. at 102. Tiffner himself testified that he did not recall seeing any tattoos on Petitioner's arms.  Trial TR. October 20, 2004, P. 109.

## 2. Application

Midway through Petitioner's trial, his attorney asked the trial court for permission to have Petitioner stand up, take off his shirt, show the jury his tattooed arms, and sit back down. Petitioner apparently was wearing a white tank top under a short sleeved shirt when his attorney made the request. Petitioner did not testify, and the prosecutor maintained that having Petitioner display his physical characteristics to the jury was comparable to testimony which he could not cross-examine.

The trial court initially ruled that Petitioner could take off his shirt before the jury entered the courtroom and sit at the defense table in his tank top, but that he could not display himself to the jury. The court then changed its mind and ruled that even that conduct would be inappropriate. The court did say, however, that defense counsel could ask Petitioner's girlfriend whether Petitioner had tattoos at the time of the crimes. Trial TR. October 21, 2004, Pp. 149-53.

This Court finds that the trial court erred in ultimately denying defense counsel's request to have Petitioner exhibit his extensive arm tattoos to the jury by having him stand up wearing a white tank top.

A highly respected treatise on criminal procedure states:

> The trial judge may violate due process by excluding evidence
> critical to the defendant's presentation of a defense. . . .

LaFave, Israel, King and Kerr, Criminal Procedure 3d Ed. 2007, Vol. 1, §2.7(a) Pp. 674-75. In § 2.7(b), n. 94, the treatise elaborates:

> Consider also *Crane v. Kentucky*, 476 U.S. 683 (1986), where the
> Court held unconstitutional the exclusion from trial of evidence
> concerning the circumstances surrounded by defendant's

confession.  The Court noted in this regard that "whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" which the state had violated.

*Id*. at 684, n. 94.  As noted above, this quote from *Crane* was cited with approval in *Holmes v. South Carolina*, 547 U.S. at 324.

In the instant case the Court deprived Petitioner of his constitutional right to present a defense by exhibiting his arms via a tank top shirt to show the jury his extensive, prominent arm tattoos, which the defense asserted, prosecution's victim witnesses never mentioned in their description of this defendant.  The trial court was aware early on that this issue was going to be Petitioner's principal defense.  In his opening statement, defense counsel stated:

> The weak link is the identification.
>
> . . . .
>
> The evidence will show that he identified him as wearing a white tank top, meaning a lot of his body is exposed.  And what you'll learn, because I will display his body to you, and you'll also hear from officers who interrogated Mr. Chandler, he has got, at least, twelve tattoos on his body.  And on his arms alone he has four tattoos on each arm.

Trial TR. October 20, 2004, P.60, 62.  The prosecutor did not object to this argument either as it came in, or after opening statements had concluded.  Nor did the trial judge object.

As the trial progressed, defense counsel adhered to his promised plan, informing the judge:

> My client has now obtained a white tank top and part of my defense would be to display his body to the jury, and his arms.  I believe I'm allowed to do that because it's non-testimonial, the same thing the police are able to do when they scrap [sic] fingernails to obtain evidence.  I can show his body just as the jury

8

can see and has seen his facial characteristics . . . .

Trial TR., October 21, 2004, P.149.  The prosecutor objected, arguing that defense counsel

would have to put his client on the stand so he could be cross-examined. *Id.*

The trial judge initially made the correct legal decision:

> I'll let him, if he wants to take off his shirt and sit there and not say
> anything or make any moves to the jury, he can do that.

*Id*. at 152.  The trial judge then, unsolicited, changed her mind:

> On second thought, I don't think it's appropriate for him to do that.
> If you want to ask his girlfriend if he had tattoos at the time on that
> specific date, you can ask her . . . .

*Id*. at 153.

The trial judge erred in rejecting defense counsel's request.  The Supreme Court held in

*United States v. Wade*, 388 U.S. 218 (1967), that compelling an accused to exhibit himself in a

lineup for observation has no testimonial significance.  Accordingly, Petitioner displaying his

tattooed arms to the jury had no testimonial significance.  The trial judge's error was doubly

damaging here because defense counsel in his opening statement had, unobjected to by the

prosecutor or judge, stated that identification was the key issue and promised the jury that they

would see Petitioner's body with its extensive tattooing to support the defense's claim.

Defense counsel did follow the trial judge's suggestion in attempting to present the tattoo

defense to the jury by calling Petitioner's girlfriend, Monique Taylor, to the stand.  Ms. Taylor

testified that Petitioner had numerous tattoos, 7 or 8 on his arms, running from his wrists to his

shoulders, and that they were visible even though he is a dark complected person.  Further,

defense counsel showed Ms. Taylor a recent picture of her and Petitioner, which she validated,

and proceeded to tell the jury that it evidenced his tattooed arms.  *Id.* at 64.

Unfortunately, defense counsel did not introduce that picture, defense exhibit B, into evidence. The witness took the picture home with her. Just before closing argument, when defense counsel realized that he had not moved exhibit B into evidence, he stated he belatedly intended to introduce that picture into evidence. But he could not accomplish this because Ms. Taylor had left the picture at home. Defense counsel's proposed solution was to introduce into evidence a different photo of Ms. Taylor and Petitioner, also evidencing his tattoos, that Ms. Taylor had brought to court that day. Trial TR. October 25, 2004, Pp. 4-5. The prosecutor objected, and the trial judge sustained the prosecutor's objection. *Id*. at 6. At the end of the trial, the tattoos were not visible evidence for the jury to consider.

Thus, all things considered, Petitioner's constitutional right to present a defense was violated. However, this Court concludes that the constitutional violation was harmless.

### 3. Harmless Error Analysis

The right to present a defense is subject to harmless error analysis. *Fleming v. Metrish*, 556 F.3d 520, 536 (6th Cir.), *cert. denied*, __ U.S. __, 130 S. Ct. 103 (2009). In a habeas corpus proceeding, a trial error is harmless unless the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This assessment of the prejudicial impact of constitutional error in a state-court criminal trial applies whether or not the state appellate court recognized the error and reviewed it for harmlessness. *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007). A federal habeas court must treat the error as if it had a substantial and injurious effect on the factfinder only the court has a grave doubt and finds itself in virtual equipoise as to the harmlessness of the error. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995).

The robbery and shooting in this case occurred during daylight, and the victims had a good opportunity to view the perpetrators. At least one of the two victims (Tiffner) had a face-to-face encounter with the perpetrators and recognized Petitioner from the neighborhood. Tiffner identified Petitioner in a photographic array before trial and at trial. The other victim (Pappas) identified Petitioner at trial. The victims had a sufficient amount of time to see the perpetrators and they were certain of their identification of the two defendants at trial.

Furthermore, Petitioner's girlfriend, Monique Taylor, testified that Petitioner had numerous tattoos on both of his arms from his wrists to his shoulders and that all the tattoos were large. She also testified that the tattoos were visible despite Petitioner's dark complection. Trial TR. October 21, 2004, at 161-63. Given this testimony and the strength of the victims' identification of Petitioner, the Court is persuaded that the constitutional error "had no or a small effect" on the jury's verdict. *Tolliver v. Sheets*, 594 F.3d 900, 924 (6th Cir. 2010), *petition for cert. filed*, No. 10-6442 (U.S. Sept. 13, 2010). The error was harmless even though there was no visible evidence of the extensive tattoos for the jury to consider.

## B. The Jury Instructions

Petitioner alleges next that the trial court deprived him of a fair trial by not instructing the jury that armed robbery is a specific intent crime and that, to be found guilty as an aider and abetter, one must have the same specific intent as the principal. The Michigan Court of Appeals held that Petitioner did not preserve this issue for appellate review by objecting to the trial court's jury instructions or by requesting a separate instruction on specific intent. The Court of Appeals went on to say that the trial court's instructions sufficiently informed the jury of the specific intent necessary to convict Petitioner of armed robbery as a principal or as an aider and

abettor.

## 1. Clearly Established Federal Law

The question on habeas review of jury instructions is not whether the instructions were "undesirable, erroneous, or even 'universally condemned.'" *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Instead, before a federal court may overturn a state conviction, the ailing instruction must have either violated "some right which was guaranteed to the defendant by the Fourteenth Amendment" or infected the entire trial to such an extent that the resulting conviction violates due process. *Id*. at 146-47.

In Michigan,

> [t]he elements of an armed robbery are (1) an assault and (2) a felonious taking of property from the victim's person or presence while (3) the defendant is armed with a weapon described in the statute. Armed robbery is a specific intent crime for which the prosecutor must establish that the defendant intended to permanently deprive the owner of property.

*People v. King*, 210 Mich. App. 425, 428 (1995) (citations omitted). "However, a trial court is not required to use the phrase 'specific intent' in an instruction to the jury." *People v. Peery*, 119 Mich. App. 207, 214 (1982). To support a conviction for aiding and abetting a crime in Michigan, the prosecutor must prove beyond a reasonable doubt that the defendant intended to commit the crime or knew at the time he gave aid or encouragement that the principal intended to commit the crime. *Davis v. Lafler*, 609 F.3d 870, 876 (6th Cir. 2010) (quoting from *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006)).

## 2. Application

The trial court instructed Petitioner's jury that, to prove the armed robbery charge, the prosecutor had to demonstrate, among other things, that Petitioner took money or property which

did not belong to him and that he intended to take it away permanently. Trial TR. October 25, 2004, Pp. 57-58. This instruction adequately explained the element of specific intent to commit a robbery.

The trial court also instructed the jurors that, to prove guilt as an aider and abettor, the prosecutor had to demonstrate that the defendant "intended the commission of the crime alleged or must have known that the other person intended its commission at the time of giving the assistance." *Id*. at 63. This instruction adequately explained the intent needed to be found guilty as an aider and abettor.

The jury instructions, as given, sufficiently explained the concept of specific intent and the state of mind needed to be found guilty as an aider and abettor. Furthermore, Petitioner did not dispute the fact that an armed robbery occurred. He maintained that the issue in dispute was identification. He argued to the jury that there was reasonable doubt as to whether he was the person who committed the crimes. *Id*. at 30. The only time defense counsel mentioned the element of intent was in connection with the charge of assault with intent to commit murder. *Id*. at 28.

The Court concludes that the jury instructions did not infuse the trial with such unfairness as to deny Petitioner due process of law. *Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)). Accordingly, Petitioner is not entitled to the writ of habeas corpus on the basis of his challenge to the jury instructions.

### C. Newly Discovered Evidence

The third habeas claim alleges that Petitioner is entitled to a new trial based on newly discovered evidence. The new evidence came from prosecution witness William Moore, who

supposedly told Petitioner that a detective approached Moore before trial and asked Moore to testify that Petitioner and Ervin Johnson probably committed the crimes. Moore informed Petitioner that he refused to lie due to the fact that he did not know who committed the crime. Moore also informed Petitioner that, on the day of trial, the witnesses, police, prosecutor, and detectives were in a witness room reviewing police reports and discussing questions which the prosecutor expected to ask the victims. According to Moore, the detectives and prosecutor emphasized to the witnesses the need to convict Petitioner and to get him off the streets. Petitioner concludes from Moore's comments to him that the prosecutor intimidated his witnesses and relied on perjured testimony.

The Michigan Court of Appeals reviewed this issue for "plain error" because Petitioner did not raise the issue in an appropriate motion in the trial court. The Court of Appeals then concluded that Petitioner had not established a plain error affecting substantial rights.

### 1. Prosecutorial Misconduct

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Petitioner bears the burden of demonstrating that the prosecutor's conduct deprived him of a specific provision of the Bill of Rights or infected his trial with such unfairness as to make the resulting conviction a denial of due process. *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).

Petitioner claims that the prosecutor suborned perjury and intimidated prosecution witnesses into testifying favorably for the State. Prosecutors may not deliberately deceive a court or jurors by presenting false evidence, *Giglio v. United States*, 405 U.S. 150, 153 (1972),

nor substantially interfere with a witness, *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997).

## 2. Application

William Moore testified at trial that he did not know Petitioner, had never seen him before, and did not know what happened to the victims during the criminal incident. Trial TR. October 20, 2004, Pp. 127-28, 134, 136-37. This testimony was consistent with Moore's post-trial statement to Petitioner that he did not know who committed the crimes.

Brandon Tiffner's trial testimony was consistent with his pretrial statement to the police and with his identification of Petitioner at the photographic show-up. Although John Pappas did not identify Petitioner before trial, he claimed at trial that he recognized the defendants' faces.

Petitioner has failed to show that the testimony of key prosecution witnesses was false or that the prosecution influenced the witnesses to testify untruthfully. Therefore, Petitioner is not entitled to a new trial on the basis of William Moore's post-trial comments to Petitioner.

## D. The Pretrial Identification Procedure

The fourth habeas claim alleges that Petitioner was denied due process of law and a fair trial due to identification testimony that was the result of a highly suggestive pretrial identification procedure. Specifically, Petitioner contends that he was only one of two men wearing a tank top in an array consisting of eight photographs and that the other man wearing a tank top weighed sixty to eighty pounds more than he did. Because the victims described one of the suspects as wearing a white tank top, Petitioner claims that the photograph of him wearing a white tank top set him apart from the other men in the array and led to irreparable misidentification of him as the perpetrator.

The Michigan Court of Appeals reviewed this issue for "plain error" because Petitioner did not object to the identification testimony at trial. The Court of Appeals then determined that the admission of Brandon Tiffner's identification testimony did not amount to plain error.

### 1. Clearly Established Federal Law

Improper use of photographs by the police can cause witnesses to err in identifying criminals. *Simmons v. United States*, 390 U.S. 377, 383 (1968). However, "each case must be considered on its own facts." *Id*. at 384. "[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id*. at 384.

"To determine whether an allegedly suggestive pre-trial identification casts an impermissible taint on a later in-court identification, a court utilizes a two-step evaluation." *Mills v. Cason*, 572 F.3d 246, 251 (6th Cir. 2009) (citing *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994)). First, the court must decide whether the pretrial procedure was unduly suggestive, that is, whether "the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009), *cert. denied*, __ U.S. __, 130 S. Ct. 1141 (2010). Second, if the pretrial procedure was unnecessarily suggestive, the court must consider "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness'

prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200. "If an identification is reliable, it will be admissible even if the confrontation was suggestive." *Howard v. Bouchard*, 405 F.3d 459, 469 (6th Cir. 2005).

Petitioner relies on *Foster v. California*, 394 U.S. 440 (1969), a case in which the defendant was the only man in a lineup wearing a leather jacket similar to the one worn by the suspect. After the lineup, there was a one-on-one confrontation between the defendant and the complaining witness and then another lineup in which the defendant was the only person who also participated in the first lineup. The combination of those suggestive elements led the Supreme Court to conclude that the identification procedure made it all but inevitable that the complaining witness would identify the defendant, whether or not he was the real suspect, because the police in effect "repeatedly said to the witness, 'This is the man.'" *Id.* at 443. The Supreme Court stated that "[t]his procedure so undermined the reliability of the eyewitness identification as to violate due process." *Id.*

## 2. Application

Brandon Tiffner was shown a photographic array consisting of eight photographs. *See* Habeas Pet., Appendix D. All of the men pictured in the array have similar hairstyles and appear to be African Americans like Petitioner. The shirts worn by the men in the array differ in style. Petitioner and one other man are wearing a white tank top; four of the other men appear to be wearing tee shirts or knit shirts of some kind; and two men appear to be wearing a shirt with a collar. Only a small part of the men's shoulders (and, therefore, their shirts) is visible in the photographs.

Petitioner's case is distinguishable from *Foster* in that he was not subjected to a second lineup or to a one-on-one confrontation with the victim after the crime. He also was not the only person in the array wearing a tank top. In *United States ex rel. Cannon v. Montanye*, 486 F.2d 263 (2d Cir. 1973), the Second Circuit Court of Appeals concluded that, where a suspect was described as wearing a green shirt and the appellant was the only man in the lineup wearing a green shirt, the court might be disposed to hold that the identification method was impermissibly suggestive. The Second Circuit went on to say that, if one or two men were wearing green shirts, the inference of undue suggestion "would weaken very considerably." *Id*. at 268. And in an unpublished case, the Third Circuit Court of Appeals concluded that a photographic array consisting of eight photographs where the defendant was the only man without a shirt was not unnecessarily suggestive. *See United States v. Sanders*, 275 F. App'x 121, 124 (3d Cir.), *cert. denied*, __ U.S. __, 129 S. Ct. 268 (2008).

"It is not required . . . that all of the photographs in the array be uniform with respect to a given characteristic." *Jarrett v. Headley*, 802 F.2d 34, 41 (2d Cir. 1986). Furthermore, the inference of undue suggestion is weakened in this case because Petitioner was not the only person featured in a white tank top. Although the complaining witnesses described one of the suspects to the police as wearing a white tank top, the Michigan Court of Appeals correctly recognized that "clothing is easily changed and the photographic lineup was not conducted until approximately two weeks after the offense was committed, so there was little reason to suspect that the clothing of the participants in the lineup would be suggestive of the perpetrator." *Chandler*, Mich. Ct. App. No. 259430, at 6.

The Court concludes for all the reasons given above that the photographic array in

Petitioner's case was not unnecessarily suggestive. Even if the Court were to assume that the photographic array was suggestive, Brandon Tiffner's subsequent identification of Petitioner at trial was reliable for the following reasons.

### a. Opportunity to View the Suspect

The incident occurred during daylight, and Tiffner had an opportunity to view the robbers when the men approached his side of the car and asked whether he and Pappas wanted to buy some marijuana. Trial TR. October 20, 2004, P. 70. The men came within three or four feet of him, and he thought that their conversation lasted about thirteen seconds. *Id*. at 85, 101. Tiffner had a second opportunity to view the robbers when he called them back to the car. Nothing obstructed his view. *Id*. at 71. Thus, the opportunity to view the robbers was very good.

### b. Degree of Attention

It further appears that Tiffner's degree of attention was good. Although he testified at trial that he was "pretty much [in] a state of shock" at the time of the incident, *id*. at 121, he was able to describe the entire incident, including the sequence of events, the robbers' appearance and conduct, and the items taken from him and Pappas. His description of the robbers' guns as black automatic handguns with a tan or woodgrain handle led defense counsel to say in his opening statement that Tiffner "had terrific ability to perceive." Trial TR. October 20, 2004, P. 62. And because no gun was visible when Tiffner first saw the robbers, defense counsel conceded in his opening statement that the complainants' first view was "unstressed." *Id*. at 61.

### c. Accuracy of the Prior Description

Tiffner described Petitioner to the police as being a black male about 21 to 25 years old, six feet, three inches tall, about 220 pounds, brown eyes, black hair, large build, very muscular,

and wearing a white tank top.  Trial TR. October 21, 2004, Pp. 58, 104-06.  Defense counsel

conceded that Tiffner accurately described Petitioner.  Trial TR. October 20, 2004, P. 61.

### d.  Level of Certainty

Tiffner testified that he had seen Petitioner in the neighborhood prior to the day in

question.  *Id*. at 68, 96-97.  He testified at trial that he was one hundred per cent certain of his

identification at the photographic identification and at trial.  *Id*. at 117, 121.[4]  There was no doubt

in his mind; he based his identification on Petitioner's facial features.  *Id*. at 118.

### e.  Length of Time between the Crime and Confrontation

Only two and a half weeks elapsed between the crime and Brandon Tiffner's viewing of

the photographic array.  A lineup that occurs two weeks after the offense is not a basis for

concluding that a substantial likelihood of misidentification existed when, as here, there was a

prior face-to-face encounter.  *Milton v. Procunier*, 744 F.2d 1091, 1102 (5th Cir. 1984) (citing

*Manson v. Brathwaite*,  432 U.S. 98 (1977); *Biggers*, 409 U.S. at 188; *Branch v. Estelle*, 631

F.2d 1229, 1234 (5th Cir. 1980)).

### f.  Summary of Factors

To summarize, Brandon Tiffner had a good opportunity to view the criminals at the time

of the crime, and his degree of attention was good despite the fact that he was frightened.  In

addition, his description of Petitioner was accurate, he was certain of his identification, and there

was not a lengthy period of time between the crime and the face-to-face confrontation.  The

---

[4] John Pappas did not participate in a pretrial identification procedure, but he was certain
at trial that Petitioner was one of the suspects because he recognized Petitioner's face.  He had
no doubt that the defendants were the two individuals who robbed and assaulted him and Tiffner,
and he maintained that he had not talked with Tiffner between the date of the crimes and trial.
Trial TR. October 21, 2004, Pp. 8, 49-50.

Court therefore believes that, even if the pretrial photographic array was unnecessarily suggestive, Tiffner's identification of Petitioner was reliable. Petitioner was not denied a fair trial, and he has no right to habeas relief on the basis of his challenge to the identification testimony.

### E. Trial Counsel

The fifth and final habeas claim alleges that Petitioner was denied effective assistance of trial counsel. Petitioner maintains that defense counsel should have (1) moved for suppression of the victims' identification testimony, (2) sought an in-court line-up, and (3) produced an expert witness on eyewitness identification.

The Michigan Court of Appeals presumed that defense counsel decided as a matter of trial strategy not to call an expert witness. The Court of Appeals also determined that counsel's failure to produce an expert witness did not deprive Petitioner of a substantial defense because defense counsel was able to pursue other methods for attempting to discredit the identification testimony.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-pronged test that must be satisfied to find ineffective assistance of counsel. First, the petitioner "must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Second, the petitioner "must show that the deficient performance prejudiced the defense." *Id*. A petitioner is prejudiced if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "Judicial scrutiny of counsel's performance must be highly

deferential." *Id*. at 689. A habeas court must presume that the challenged action is sound trial strategy. *Id*.

### 1. Failure to Move for Suppress of the Pretrial Identification

Petitioner alleges that his trial attorney should have moved to suppress the complainants' identification of him. It is obvious from the record, however, that Petitioner and his attorney made a strategic decision not to file a motion to suppress the pretrial identification. Defense counsel informed the trial court on the first day of trial that he had consulted Petitioner and that they had decided not to have the court evaluate the legality and admission of the line-up, but to allow the jury to decide the issue. Trial TR. October 20, 2004, P. 5. A trial attorney's strategic choices "are accorded strong deference." *Howard v. Bouchard*, 405 F.3d at 481 (citing *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996), *overruled on other grounds, Abdur'Rahman v. Bell*, 392 F.3d 174 (6th Cir. 2004)).

Furthermore, the photographic array was not unnecessarily suggestive and Brandon Tiffner's in-court identification was reliable even if the pretrial confrontation was deemed suggestive. Therefore, defense counsel was not ineffective for failing to move to suppress the complainants' identification of Petitioner. An attorney is not ineffective for failing to file a meritless motion. *Johnson v. Tennis*, 549 F.3d 296, 303 (3d Cir. 2008) (citing *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999)), *cert. denied*, __ U.S.__, 129 S. Ct. 2774 (2009).

### 2. Failure to Request an In-Court Line-up

Petitioner alleges next that his attorney should have requested an in-court lineup. Petitioner had no constitutional right to an in-court lineup. *United States v. Davies*, 768 F.2d 893, 903 (7th Cir. 1985).

> Generally, the question of the suggestiveness or credibility of the in-court identification is to be resolved ultimately by the jury after the defendant has had an opportunity to test the accuracy of an identification through cross-examination. Only when there is 'a very substantial likelihood of irreparable misidentification' is the credibility of the identification not left for the jury to decide.

*Id.* at 904 (citations omitted). There was not a substantial likelihood of irreparable misidentification in this case. Thus, there was "no error in leaving the reliability of the identification for the jury's determination." *Id.*

Furthermore, an in-court lineup likely would have prejudiced Petitioner instead of helped him. John Pappas recognized Petitioner at trial and Brandon Tiffner had previously identified Petitioner. The Court concludes that defense counsel was not ineffective for failing to request an in-court lineup.

### 3. Failure to Produce an Expert Witness

Petitioner's final allegation about defense counsel is that his attorney failed to present the testimony of an expert witness on eyewitness identification. The failure to call an expert witness on eyewitness identification does not satisfy the *Strickland* standard where defense counsel made a tactical decision not to call such a witness, presented alibi witnesses, and cross-examined the eyewitnesses regarding inconsistences in their identification of the petitioner. *See Dorch v. Smith*, 105 F. App'x 650, 657 (6th Cir. 2004). Petitioner's attorney presented an alibi witness, and he cross-examined both Brandon Tiffner and John Pappas concerning their identification of Petitioner. The attorney also addressed the issue of identification in his opening statement and closing argument. Under the circumstances, he was not ineffective for failing to produce an expert witness on eyewitness testimony.

### IV. Conclusion

The state appellate court's decision did not result in an unreasonable determination of the facts and was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Therefore, the petition for a writ of habeas corpus is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED** because reasonable jurists would not disagree with the Court's resolution of Petitioner's claims, nor conclude that the issues are adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Petitioner nevertheless may proceed *in forma pauperis* on appeal because an appeal would be taken in good faith. 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a)(4)(B).


S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: November 17, 2010

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 17, 2010.


S/Denise Goodine
Case Manager